# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UTICA MUTUAL INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CV00664 ERW |
| | ) | |
| BANCINSURE, INC., | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

Two insurance companies come to the Court for resolution of their dispute concerning equitable contribution. Utica Mutual Insurance Company ("Utica") and BancInsure, Inc. ("BancInsure") provided insurance coverage to Heartland Payment Systems, LLC ("Heartland") for losses incurred by Heartland as a result of acts of fraud committed by Golf Concepts, Inc. ("Golf Concepts"). In another forum, Heartland sued Utica and BancInsure for breach of respective insurance contracts where it recovered judgment from Utica which now seeks recovery against BancInsure for equitable apportionment of sums Utica paid to Heartland. The issue in the case is whether the loss to Heartland resulted from fraud of Golf Concepts as defined in the terms of coverage of the BancInsure policy.

## I. FINDINGS OF FACT

Mike Schultz from Clark Mills, New York, is a senior staff attorney with Utica who testified that Utica writes insurance coverage that includes automobiles, homeowners, commercial, general liability, business owners, workmans' compensation, directors and officers, errors and omissions,

surety and fidelity. In the 1990's, Utica wrote merchant chargeback indemnity coverage.[1] (Hearing Tr. Vol. I P. 31 L. 7-19). He testified that merchant chargeback indemnity policies are provided to the processing entities that process credit card transactions to cover losses suffered by processing companies in the form of uncollectible chargebacks. A chargeback occurs when a customer charges something on a credit card and a message is transmitted through a clearinghouse, sometimes called a middleman or a merchant processor which, in turn, seeks approval from the issuing bank or the company issuing the credit card. If the charge is approved but the customer, e.g., ordering through a catalog, does not receive the item, she or he would notify the bank or company issuing the credit device of non-receipt, and the bank or issuing company would debit the clearinghouse for the amount of the charge. The clearinghouse would then go to the merchant to try to collect the amount of the chargeback. If the collection effort is unsuccessful, an uncollectible chargeback results. (Hearing Tr. Vol. I P. 33 L.4- P.34 L.9).

Heartland is a clearinghouse for credit card transactions. Heartland cleared credit card transactions insured by Utica. Harden Utica Managers is described as an independent contractor of Utica, authorized to write fidelity coverage on Utica paper, "and they were, in effect, an agent of Utica" that accepted an application for an insurance policy or bond. (Pl. Ex. 2) (Hearing Tr. Vol. I P. 36 L.1, 12-25). The policy or bond issued by Utica (which, for the purposes of this litigation, are agreed to be terms with interchangeable meaning), was merchant specific, "meaning the policy applied to credit card transactions that were only initiated through the sale by Golf Concepts, and the analysis

---

[1]A chargeback involves a customer contacting their credit card company. (Hearing Tr. Vol. III P.31 L.22-P.32 L.1). Credits to customers, as distinguished from chargebacks, were handled directly by Golf Concepts.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

as to how much of a risk we may be undertaking wasn't based on the viability or the financial stability of Heartland. It would be based more on the viability or financial stability of the merchant, Golf Concepts, and the manner of the business that they were representing they were undertaking. So, in effect, rather than looking into the named insured, the Heartland background, Utica had to be sure or look into the background of the merchant that was going to be involved in the credit card transactions, that being Golf Concepts." (Hearing Tr. Vol. I P. 41 L.7-20). He testified that the risk for Utica was with Golf Concepts.

Plaintiff's Exhibit 2 reflects the representation made in the application that Golf Concepts was not a telemarketing company. The refund policy of Golf Concepts as represented was "one hundred percent refund anytime." (Hearing Tr. Vol. I P. 42 L. 24-P. 43 L.3). Golf Concepts represented that there was no charge for the goods or services prior to receipt by the customer. (Hearing Tr. Vol. I P. 44 L. 3-4). Utica issued a merchant specific policy or bond, referencing the special merchant, Golf Concepts, to Heartland with a liability limit of $1.2 million on February 25, 1998. (Pl. Ex. 3).

Golf Concepts was a retailer of golf equipment. Covered acts under Utica's policy included failure to reimburse a cardholder following non-delivery of a product to a cardholder, processing mail order transactions that are not authorized by the insured, processing telephone order transactions not authorized by the insured, factoring of bankcard transactions, misappropriating cardholder funds on deposit with the merchant, making material misrepresentations in a merchant ap0plication to the insured, processing bankcard transactions not authorized by a cardholder, using deceptive or misleading methods to solicit funds from a cardholder, or use of counterfeit, lost, or stolen credit card numbers by merchants. (Pl. Ex. 3A) (Hearing Tr. Vol. I P.47 L.21-P.48 L.10).

3

The Utica policy or bond had an "Other Insurance" clause which provided that if there is, in existence, other insurance which applies to the loss, that insurance applies first and then the Utica policy or bond would apply. In September or October of 1998, a proof of loss form (Pl. Ex. 10) making a claim under Plaintiff's Exhibit 3 from Heartland for $1.8 million came to Utica which was assigned to Mr. Schultz, who assigned it to Mr. Martin O'Leary, an attorney, for investigation. He, in turn, hired a forensic accountant named Bill James who went on site and reviewed chargeback documents. Utica ultimately concluded that the acts were covered acts and Utica should pay under the policy, but that there was concurrent coverage, and accordingly, Utica was liable only for the amount of the deductible under the BancInsure policy, which Utica paid in full. "The amount in excess of that for which there had been documentation, we paid what we felt was our pro rata share." (Hearing Tr. Vol. I P.53 L. 10-16).

The Proof of Loss form submitted by Heartland to BancInsure is Plaintiff's Exhibit 12. The BancInsure policy with a limit of liability of $10 million and a $500,000 deductible, also had an 'Other Insurance" clause. The state court adjudication provided that Utica would pay its full policy limit. (Pl. Ex. 16). Utica was compliant in paying the policy limit, plus interest. (Pl . Ex. 17). Utica now seeks equitable contribution from BancInsure to return of a portion of what it paid. Utica's damages' calculation is set forth in Plaintiff's Exhibit 21. Total chargebacks claimed by Heartland were $1,819,376.51. $500,000 is deducted from that sum as the deductible under the BancInsure policy which Utica does not dispute that it owes. Utica's claim is that the net concurrent coverage is $1,319,376.51. Utica then calculated that the available amount of coverage under its policy after paying the $500,000 deductible was $700,000. Utica then used that as a numerator over the denominator being the total amount of coverage available between the two policies to arrive at a pro

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

rata share or a percentage of 6.54 which Utica concluded was its fair share of the net concurrent coverage. That percentage multiplied times total chargebacks equals $86,287.22, or Utica's claimed share of the concurrent coverage. Mr. Schultz then calculated a per diem interest rate of $21.28 using the Missouri statutory rate of 9% with a beginning date of November 8, 1999, the date Utica made its first initial payment. (Hearing Tr. Vol. I P.64 L. 16-P.65 L.2).

Because losses were continuing at the time of its first payment, Utica anticipated future proof of loss claims being filed. The per diem interest rate was calculated to end on December 6, 2005, the date that Utica paid the balance of its policy limits pursuant to a prior state court judgment declaring Utica was responsible for the balance of policy limits. Utica's position is that it overpaid its lawful share of losses and that payment stopped interest from running. Utica believes that its total lawful obligation to Heartland is $133,528.82. (Hearing Tr. Vol. I P.65 L.22-25). The total payment to Heartland by Utica includes:

$19,473.80[2] - the initial payment made to Heartland on receipt of the initial proof of loss;
$500,000.00 - the amount of the deductible for which there was no concurrent coverage;
$680,526.20 - amount of judgment entered by state court for balance of remaining coverage;
$269,656.19 - amount of prejudgment interest entered by the state court against Utica:
$142,682.61 - postjudgment interest accumulated from the judgment until December 6, 2005.

On top of the $500,000 deductible, the amount paid to Heartland by Utica was $1,112,338.80. (Hearing Tr. Vol. I P.67 L.5-15). Utica's position is that only $133,528.82 of that

---

[2] The figure in this chart is from Plaintiff's Exhibit 21, however, at trial, this figure was stated as $19,000. (Hearing Tr. Vol. I P.66 L.2-3). The court will use the sum from Exhibit 21 as it appears that the witness was merely rounding off the above figure.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

sum was owed to Heartland by Utica, and that Utica overpaid by a sum of $978,809.98. (Hearing Tr. Vol. I P.66 L.1-P.67 L.25). Utica is claiming equitable contribution damages from BancInsure in the amount of $978,809.98. (Hearing Tr. Vol. I P.67 L. 19-24). Additionally, Utica is seeking both prejudgment and postjudgment interest.

Mr. Schultz admitted on cross-examination that it was known at Utica that Golf Concepts was engaged in telemarketing and that Utica was writing a risk for telemarketing. (Hearing Tr. Vol. I P.72 L.2-21) (Pl. Ex. 2 P.2). On redirect examination, he retreated from that testimony. He testified that if Golf Concepts was utilizing a telemarketing model, he would have expected information to be provided where a sample script of telemarketing is requested. (Hearing Tr. Vol. I P.82 L. 19-23). He testified that Utica had a cross-claim against BancInsure in the underlying state court action, but was precluded by the trial judge from adducing evidence against BancInsure because of a motion *in limine* ruling that no evidence of fraud by Golf Concepts would be heard without expert testimony. That cross-claim was not dismissed by Utica until the state case was on appeal. In its investigation of the claim, Utica issued a "reservation of rights" letter to Golf Concepts, but did not mention Utica was claiming fraud. (Hearing Tr. Vol. I P.78 L. 2-24) (Pl. Ex. 13). In the claim process, Utica quickly took the position that it should terminate the policy early. Robert Carr, Princeton, New Jersey, is Chief Executive Officer and Chairman of the Board of Directors of Heartland, where he has been associated since 1997. He first learned of Golf Concepts in 1998, understanding that the Company was a mail order/telephone order (MOTO) merchant with a large volume of sales of more than $250,000 annually. Initially, Mr. Carr did not want to process the Golf Concepts' account because of risk. Heartland purchased a bond from Utica and an insurance policy from BancInsure, both to insure against Golf Concepts' risk. Golf Concepts executed a Merchant Bankcard

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Application with Heartland. Mr. Carr testified from documents in the Heartland underwriting file that Golf Concepts represented it was an 80% inbound telephone order sales company and a 20% outbound sales company. Golf Concepts represented in its application that it was a "zero" volume future delivery company. (Hearing Tr. Vol. I P.108 L.7-18) (Pl. Ex. 1). Someone at Golf Concepts signed a document that stated, "[m]erchant acknowledges that the act of processing a credit card sale for the purpose of receiving money for a sale which has not been fulfilled is fraudulent, is a felonious act, and is expressly forbidden by the agreement." (Hearing Tr. Vol. I P.109 L.9-20).

Mr. Carr understood that Golf Concepts had a relationship with local merchants. In response to incoming calls, personnel at Golf Concepts would tell callers to try their clubs and if they were dissatisfied, callers could return the clubs if they did not like them and "we'll give you your money back." (Hearing Tr. Vol. I P.128 L.19-23). Golf Concepts represented that credit cards of customers would not be charged before goods were shipped. Mr. Carr learned that, in fact, Golf Concepts did charge cards without clubs being sent. Golf Concepts represented that the bulk of their business was from inbound telephone orders from referrals from local golf shops. When the business began to fail, Golf Concepts changed to outbound telemarketing. Mr. Carr learned from a letter he received from an attorney for Golf Concepts in September, 1998, that Golf Concepts did not honor its contract with Heartland, and that Golf Concepts was direct telephone marketing of a test/play program where customers were allowed to use new clubs for 90 days, and customers credit cards are charged for the full retail price of the clubs with their consent. (Pl. Ex. 7). The customers had to wait 90 days before the clubs could be returned for a refund. Mr. Carr received a second letter from Golf Concepts' attorney dated October 5, 1998, advising Mr. Carr that "the total amount of dollars of unshipped clubs is approximately $540,000.00." (Pl. Ex. 9). Golf Concepts had been calling people and billing

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

them without sending out clubs. Mr. Carr concluded that the original owners of Golf Concepts conspired to defraud Heartland. (Hearing Tr. Vol. I P.138 L.7-23). Heartland stopped processing Golf Concepts' accounts, then resumed processing when Utica told Heartland to resume processing the Golf Concepts' account. Heartland ceased processing the Golf Concepts' account in 1999.

Heartland originally submitted a proof of loss form to Utica claiming a loss of $528,000 (Pl. Ex. 10) then sent a second proof of loss form claiming the loss might be as much as one million dollars. (Pl. Ex. 11). There was a third proof of loss form that Heartland submitted to BancInsure (Pl. Ex. 12) where Heartland was claiming merchant fraud. By this time, the loss was about $1.5 million. Mr. Carr represented to BancInsure that "Golf Concepts was engaged in the business of selling golf clubs through telephone solicitation" and "falsely represented to customers that if the clubs were returned during or after a 90-day trial period, the full amount of the customer's payment would be refunded." (Hearing Tr. Vol. I P.144 L.19-P.145 L.6). Mr. Carr further testified that he had notified BancInsure that "Golf Concepts also defrauded its customers by failing to deliver clubs paid for by customers and returning the amount paid." (Hearing Tr. Vol. I P.145 L.7-13).

On cross-examination, Mr. Carr stated that he believed he was purchasing an umbrella policy from BancInsure. (Hearing Tr. Vol. I P.156 L.3-8). However, Mr. Nicoll confessed that there is no language in the BancInsure policy declaring that it is an "umbrella policy." (Hearing Tr. Vol. II P.148 L.19-22). He believed he was purchasing a policy to cover merchant losses related to the use of plastic cards. Mr. Carr believed that Golf Concepts committed fraudulent acts when principals took money from the Company which did not involve plastic cards. (Hearing Tr. Vol. I P.157 L.17-21). When he sent in the proof of loss form to BancInsure, he believed the policy covered merchant losses. He acknowledges that the BancInsure policy is titled a "Plastic Card Fraud Policy." Mr. Carr was

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

examined in Bankinsure's phase of the trial. He testified that Heartland is the sixth largest bankcard processor in the world with 2,100 employees processing fifty billion dollars annually in Visa and Mastercard transactions. (Hearing Tr. Vol. II  P. 43 L.24-P.44 L.2; P.44 L.19-23). When Mr. Carr purchased the BancInsure policy, he was looking for coverage "that if we had a big loss, that it would not impact the capital of Heartland Bank." (Hearing Tr. Vol. II  P.67 L.4-7). He testified, "we wanted to be covered basically for merchants' fraud because if merchants went out of business and didn't pay their fees, which is a common thing, we could absorb those losses without a problem." (Hearing Tr. Vol. II P.67 L.22-25). He was looking for coverage to cover losses that would put Heartland out of business. He understood that the BancInsure policy would cover losses regarding plastic cards, because those were the only kind that Heartland processed. (Hearing Tr. Vol. II P.68 L.18-25). He recognized that the policy limit on the BancInsure policy was $10 million. (Def. Ex. B).

After getting the letter from Mr. Bastian, Golf Concepts' attorney, Mr. Carr contacted Mr. Martin O'Leary at Utica about what Heartland should do when confronted with the loss. Mr. O'Leary agreed that the plan to try to salvage Golf Concepts was a good one, and assured Mr. Carr that the Utica bond would remain in force until its expiration. Mr. Carr then contacted A.J. Nieblas who was running Golf Concepts. He thought the Company was viable. Mr. Carr then contacted Golf Concepts' suppliers and the payroll company, and assured them that Heartland would make sure that all employees got paid and that payment would be made for the golf clubs, and that they would be shipped to cardholders, whose cards would not be charged until the golf clubs were shipped. Mr. Carr also instructed that if customers were unhappy, they would get a refund. (Hearing Tr. Vol. II. P.70 L.10-P.72 L.16). Mr. Carr had learned from a golf supplier that founders of Golf Concepts had

9

taken all of the money out of the Company and left the managers to run the Company. When he learned of the losses from Golf Concepts, Mr. Carr contacted Utica, but did not contact BancInsure. He now realizes that he should have also contacted BancInsure. (Hearing Tr. Vol. II P.74 L.19-P.75 L.6).

Mr. Carr became involved in the management of Golf Concepts to mitigate the losses for all of the parties and to keep people employed. He testified that doing so was a mistake, because Utica ultimately terminated the bond, and he was unwilling to take all the risks. He again decided to stop processing Golf Concepts' business. (Hearing Tr. Vol. II P.77 L.20-P.77 L15). During the time Mr. Carr was overseeing the operations of Golf Concepts, he saw no evidence that the sales force had fraudulently induced customers to enter into the test/play program, nor did he see the sales force mislead customers about the test/play program. He was asked, "So, sir, just so I'm clear, where did the fraud in the use of plastic cards if we're not seeing it with the sales force?" Mr. Carr answered, "[t]he fraud to me was taking all the money out of the company." (Hearing Tr. Vol. II P.79 L.25-P.80 L.4). Heartland submitted a second proof of loss form to Utica immediately after Utica terminated the bond and Mr. Carr stopped overseeing Golf Concepts' business.

Mr. Carr initiated a lawsuit in state court against Utica and BancInsure. During the litigation, he settled Heartland's claims against BancInsure for one million dollars. (Def. Ex. V). Total uncollectible chargeback losses of Heartland from Golf Concepts were in the order of $1.8 million.

When Utica terminated the bond, it sent Heartland a check for $519,000; $500,000 for the deductible on the BancInsure policy and $19,000, representing Utica's estimate of its pro rata share of the remainder of the loss. It was Utica's position that Utica's obligation would be about 10%. (Hearing Tr. Vol. II P.98 L.19-P.99 L.24) (Pl. Ex.G).

10

Christina Marie Solomon, St. Louis, Missouri, certified public accountant, is manager at RubinBrown, LLC, working in the Corporate Finance and Forensic Services Group. This group focuses on litigation, consulting and handling expert testimony assignments. She has a specialty identified as Certified Fraud Examiner. Her hourly rate is $190.00. Her firm has committed just under 100 hours to this case. She testified that the chargeback documents she examined filled six bankers' boxes. She performed a nonstatistical random examination of about fifty chargeback documents from each box so that she looked at hundreds of the chargeback documents.

Ms. Solomon testified that a test/play scam is one where golfers are solicited by telephone to test new prototype state-of-the-art clubs before they are introduced to the market. Customers are assured that this is a limited trial offer, and that they may return the clubs, no questions asked, or keep them for a discounted price. A 60 or 90-day test trial period is often specified, during which time customers must continue to use the golf clubs. Dissatisfied customers who desire to return the golf clubs early find that they cannot return the clubs because they are outside the window to seek reimbursement. (Hearing Tr. Vol. I P.187 L.20-P.188 L.13). She testified that those desiring a refund must call a special number within a specified five-day window to obtain the authorization. Failure to strictly comply will result in no refund. Her examination of documents revealed, in this case, that a "telephone game" often resulted where customers were told they could not return the clubs. If the clubs were returned without an authorization number, customers often found that they were without the clubs and a refund. The solicitation letter (Pl. Ex. 13) of Golf Concepts states that the return authorization will not be granted until the full 90 days is up, and following that, there is a five day grace period for customers to call for an authorization number. After the five-day grace period, returns will no longer be accepted. The last sentence cautions customers not to call their

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

credit card companies, because Golf Concepts is required to authorize and process all refunds. "What's interesting about that note is that, as I've said before, there's often a 60 to 90-day window that you have to dispute a charge with your credit card company and if you are instructed not to contact them until after the 90-day test period, you can find yourself in a situation where the credit card company can't issue a chargeback or assist you in any way." (Hearing Tr. Vol. I P.190 L.16-22). The solicitation letter suggests to Ms. Solomon that Golf Concepts was utilizing the 90-day test/play scheme or scam. If Golf Concepts had not been utilizing a scam and was utilizing a true testing procedure, she would have expected there would be some type of testing information that would then be marketed to the golf industry. In everything she reviewed, including "chargeback documents, any document, any deposition, anything at all, . . ." she saw "nothing to that effect nor references to that effect." (Hearing Tr. Vol. I P.191 L.22-P.192 L.10). The Better Business Bureau recognized Golf Concepts among other companies as utilizing practices that were "deceptive and misleading." (Pl. Ex. 18-11). She referenced a golf trade publication that associated Golf Concepts with this practice. She referenced a chargeback document of John Koenig who disputed a charge on his credit card statement for $1,070.00 where he returned the unused merchandise to a retailer by mail, requesting the charge be removed, claiming that he was misled. (Pl. Ex. 18-20). For testing the clubs, Mr. Koenig was promised receipt of a Ping Cup putter which he could keep just for participating. The clubs he received were "knock offs," ripoffs of existing designs, rather than prototypes. In another chargeback document, Mr. Novaro relates that he believed he was not making a purchase, but testing new designs, and that his credit card company "would only bill him the interest and Golf Concepts would reimburse him for that." He states that, "he's being charged for buying these clubs and he can't return them except for specified windows and now he's basically stuck with

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

clubs that he never wanted in the first place, that it was all supposed to be a test." (Hearing Tr. Vol. I P.200 L.5-19) (Pl. Ex. 18-21). In another chargeback document pertaining to Alan Mihok, he states that he received the solicitation over the telephone, then received a letter advising that he was allowed to return the merchandise within a five-day grace period, but could not get an answer as to when the five-day grace period would begin. Golf Concept's phone system told him to dial zero, but compliance resulted in being disconnected. (Pl. Ex. 18-22). Ms. Solomon concluded that Heartland's uncollectable chargeback losses in the amount of $1.8 million were consistent with fraud. In defining fraud, she included common themes such as the misrepresentation or omission of a material fact that is made with the intention that somebody rely on it. (Hearing Tr. Vol. I P.203 L.12-17; P.204 L.14-23). She opined that the causes of the chargebacks to Utica and BancInsure by Heartland were consistent with fraud; that the causes of the chargeback losses from Golf Concepts were consistent with fraud; that her conclusion of "consistent with fraud" means the conduct meets all of the elements that are commonly associated with fraud; that Golf Concepts acted consistent with fraud in causing these chargebacks to occur to Heartland; that Golf Concepts made material misrepresentations to both Heartland and its customers; that Golf Concepts charged victim's credit cards and either did not deliver goods or did not make refunds when the goods were returned; and the cause of all the losses was consistent with fraud under Golf Concepts' 90-day test/play scheme. (Hearing Tr. Vol. I P.205 L.11-P.206 L.15).

Frederick Nicoll is an attorney who has represented Heartland since its formation in 1997, and who represented Heartland in the underlying state court action. (Hearing Tr. Vol. II P.106 L.8;12;14-15;20-22). Mr. Nicoll notified Utica on September 30, 1998 that a claim was likely to be filed. This notification was prompted by Robert Carr's, Heartland's Chief Executive Officer, receipt

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

of a communication from an attorney representing Golf Concepts which caused Mr. Carr to be concerned over potential losses to Heartland. (Def. Ex. X) (Hearing Tr. Vol. II P.107 L.116-119; P. 110 L.10-21). Mr. Nicoll received a response from Mr. O'Leary representing Utica. (Def. Ex. Y). Thereafter, after many conversations between Mr. Nicoll and Mr. O'Leary, an accord was reached whereby Mr. Carr would assume a management role in Golf Concepts to try to salvage the Company, thereby reducing losses. (Hearing Tr. Vol. II P.112 L.23-P113 L.14). Anticipating a loss to Heartland, Mr. Nicoll filed a proof of loss form with Utica on January 20, 1999, in the amount of $528,000, even though the amount of the actual loss was not known at that time. This was done to avoid a possible cancellation of the policy. (Pl. Ex. 10) (Hearing Tr. Vol. II P.116 L.6-17).

In April, 1999, Mr. Carr informed Mr. Nicoll for the first time of the existence of a second insurance policy issued by BancInsure. Around April 20, 1999, when Mr. O'Leary learned of the existence of another insurance policy, Mr. O'Leary said, "[t]hat's it; we will not extend the Utica policy." Because of Utica's position, Heartland discontinued processing for Golf Concepts. (Hearing Tr. Vol. II P.119 L.9-21). Mr. Nicoll then prepared a second proof of loss form directed to Utica in July, 1999, based on information of sustained losses of Heartland. (Pl. Ex. 11) (Hearing Tr. Vol. II P.120 L.5-16). On July 25, 1999, Mr. Nicoll filed a proof of loss form under the terms of the BancInsure policy with BancInsure. (Pl. Ex. 12) (Hearing Tr. Vol. II P.121 L.11-24). The time for filing a proof of loss form with BancInsure was extended. Mr. Carr first said that he checked the box "Merchant Fraud" when filing the proof of loss form which seemed prudent to him at the time, then later he said he did so "almost arbitrarily." (Hearing Tr. Vol. II P.123 L.7-13; P.127 L.2-21).

Shortly before the underlying state case was tried, BancInsure agreed to settle Heartland's claims and claims of two other merchants, SourceOne Acendix and another company later described

14

by Mr Ricciardi as Liberty. (Hearing Tr. Vol. II P.129 L.24-P.130 L.10; L.17-21) (Hearing Tr. Vol. II P.161 L.17-23). The claims filed by these other merchants had nothing to do with Golf Concepts. (Hearing Tr. Vol. II P.161 L.2-23). At the time of the settlement between Heartland and BancInsure, the universe of the chargebacks was $1.8 million. Heartland settled with BancInsure in the underlying state court action for $1 million, and this settlement resolved all of Heartland's claims in that action. (Hearing Tr. Vol. II P.150 L.5-25). Heartland agreed to hold BancInsure harmless should Utica make a claim against BancInsure. At that time, Utica had made a cross claim against BancInsure in the underlying case. For Utica to prove fraud in the underlying action, it needed an expert forensic analyst which had never been disclosed. Heartland's position was that Utica would lose on its contribution claim on the law in the state court action, for failure of expert testimony, and accordingly, an agreement to indemnify BancInsure for successful claims of fraud by Utica seemed a minimal risk. Heartland did not believe that Utica could resurrect its fraud claim against BancInsure at a later time after Utica was barred from presenting offensive evidence of fraud. (Hearing Tr. Vol. II P.138 L.18-P.139 L.12).

Jason Ricciardi is an accountant from Nashville, Tennessee, retained by BancInsure to determine if credit card fraud had been committed.[3] Three companies, Golf Concepts, SourceOne Acendix and Liberty were the subject of inquiry.[4] Golf Concepts was not related to the other two

---

[3]When Mr. Ricciardi was hired by BancInsure, he was not asked to conduct an independent investigation into the operation of Golf Concepts. He was asked to analyze the [Heartland] claim as it was submitted. (Hearing Tr. Vol. III P.28 L.6-11).

[4]In the testimony of witnesses, reference is made to SourceOne and Ascendix, and SourceOne Ascendix and Liberty. In another place the companies are described as Ascendix and SourceOne and Liberty. The differences are irrelevant to the analysis.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

companies. (Hearing Tr. Vol. II P.161 L.2-23). Mr. Ricciardi traveled to Arizona to review documents collected in an F.B.I. investigation, and concluded that SourceOne and Liberty were fraudulent companies. He reported those findings to BancInsure. (Hearing Tr. Vol. II P.162 L.20-P.163 L.1). He concluded that Golf Concepts was a different situation; that it was a going concern business, and he could "not make the determination that the overall company was fraudulent." (Hearing Tr. Vol. II P.163 L.2-5). He made his recommendation to BancInsure and recommended that consumers be consulted and individual transactions be considered. (Hearing Tr. Vol. II P.163 L.17-25). Of the eight to nine hundred hours his firm dedicated to the investigation of this case, two hundred fifty hours was Mr. Ricciardi's time. He testified that Golf Concepts' claim, as originally submitted, "kept changing." There were three or four different versions of the Golf Concepts' claim. He became uncomfortable with supplied documentation, there being tens of thousands of documents in no particular order. They went through every single document to determine if it was in the claim submitted and if it was a duplicate, error "or anything like that." (Hearing Tr. Vol. II P.165 L.4-24). By going through each document, his firm discerned a pattern and arrived at six categories of chargeback documents.

Mr. Ricciardi concluded that Golf Concepts had about $5 million in sales in 1998. (Hearing Tr. Vol. II P.166 L.3-10;19-23). His expert opinion was that Golf Concepts was a going business concern in 1998 and early 1999. It was selling product, returning funds to customers, had a supplier, and it had an attorney who contacted the bank to advise the company was in trouble. (Hearing Tr. Vol. II P.167 L.16-2). There were two thousand chargeback documents. He concluded that there were $372,000 in Heartland's claim that "had absolutely no support provided." (Hearing Tr. Vol. II P.170 L.7-16). Mr. Ricciardi recognized that Mr. Carr was of the belief that all of the chargebacks

16

were the result of fraud and the chargeback codes were not accurate. Mr. Ricciardi's examination persuaded him that based on 1,400[5] separate claims he investigated, the chargeback codes were, "for the most part, very accurate." He concluded that Mr. Carr's view that all were fraudulent was not supported by Mr. Ricciardi's review. (Hearing Tr. Vol. II P.173 L.22-P.174 L.6).

Mr. Ricciardi discovered that from customer correspondence, Golf Concepts was having problems in delivering product to customers. A supplier "cut them off." It became a very big issue. (Hearing Tr. Vol. II P.174 L.11-20; P.175 L.16-19). When he reviewed the financial and operational data available from Golf Concepts, Mr. Ricciardi could not identify "any fraudulent activity in the way the Golf Concepts' business was operated, excluding any potential fraudulent sales[.]" (Hearing Tr. Vol. II P.176 L.7-13). He testified that he lacked enough financial information provided to him to know what was going on inside the Company, because all he was given to base his opinion on was a merchant account with credit card transactions flowing through it. (Hearing Tr. Vol. II P.177 L. 15-18). He was unable to acquire information such as all underlying records or access to people conducting business. Of the six categories mentioned earlier, as to category one,[6] there was no

---

[5] Of the 2000 chargeback documents there was support for only 1,400, in that Mr. Ricciardi had either one page VITALS® screen generated by Heartland or the VITALS® screen plus consumer correspondence. The "VITALS® screen is a detail of the chargeback that came through." (Hearing Tr. Vol. III P.23 L.21-22).

[6] Mr. Ricciardi testified that Heartland submitted 2,100 claims in its proof of loss but he could only find support for 1,400 claims. Category one of his report deals with 700 claims for which there is no support. (Def. Ex. M). Categories two through six pertain to the other 1,400 claims. (Hearing Tr. Vol. II P.223 L.19-P.224 L.10). For category one, Mr. Ricciardi did not have a VITALS® screen. He said he had no support for category one. He could not tell if category one or category two even pertained to Golf Concepts. (Hearing Tr. Vol. III P.25 L.15-20).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

support provided; as to category two, there was no detail provided; as to category three, there was no evidence of fraud based on Heartland documentation; and as to category four, he found "unclear fraud based on documentation provided, . . . but I was given a heads-up that, there could be; depending on the facts and circumstances that may develop . . . ." (Hearing Tr. Vol. II P.180 L.22-23;P.180 L.14-16). As to category five, another merchant's chargeback was charged against Golf Concepts. As to category six, "I came to the conclusion that certainly there was the possibility that fraud occurred at the transaction date, . . . ." (Hearing Tr. Vol. II P.179 L.20-P.-182 L.8) (Def. Ex. J pp.5-6). He included correspondence where it appeared that the Golf Concepts' salesperson made intentional misrepresentation to the customer. He further explained the significance of VITALS® screens by saying, when a chargeback comes to a Heartland, their system would generate generic information linking the customer's credit card, and that these screens also included the merchant.

Mr. Ricciardi states that financial reports of Golf Concepts are not identified anywhere in his report, because he did not have them. He testified that he did not need them to formulate the opinions in his report. Although he claims to have looked at every single chargeback document, he included only five or six in his report. He does not recall if he asked BancInsure or attorneys to provide him with additional materials such as the underwriting file, Golf Concepts' application, anything about Golf Concepts' business model or business practices. He said if he saw the information it certainly could change his mind. (Hearing Tr. Vol. II P.238 L.24-P.239 L.11). The only operational information Mr. Ricciardi had for Golf Concepts was the bank account activity and the merchant account. (Hearing Tr. Vol. III P.30 L.2-6).

At some point, Heartland sent a letter advising Golf Concepts' customers that they had been scammed. This letter caused a lot of chargebacks, according to Mr. Ricciardi. There was a further

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

complication, according to Mr. Ricciardi, because at some time, Heartland shut down one merchant account and opened another for Golf Concepts.

Mr. Ricciardi concluded that in the summer of 1998, when Golf Concepts' supplier cut them off, the Company had no product to deliver and a lot of people wanted their money back which drove-up chargebacks because they weren't receiving merchandise. (Hearing Tr. Vol. II P.192 L.20-P.193 L.1). He acknowledged that he is aware that Golf Concepts started a 90-day money-back guarantee, test/play program. He was asked, "So, if you have a high return rate at the 90-day period, that 688,000 in June should show up as net chargebacks in September?" Mr. Ricciardi answered, "[i]f they wait till the end of the 90 days." (Hearing Tr. Vol. II P.193 L.17-P.194 L.6).

Mr. Ricciardi makes a distinction that cannot logically be supported. He opines Golf Concepts committed no fraud during the 90-day money-back guarantee test/play program when the Company did not return demanded refunds back to customers because the Company was out of money. The Company put in place a scheme designed to defraud customers. The Company was short on capitol, when the scheme was instituted. The reasonable probability was that demands for refunds would be forthcoming. Continuing the process knowing refunds would be received without funds to satisfy the demands cannot, under the Court's understanding, be so cavalierly categorized as not indicia of fraud.

Mr. Ricciardi did categorize fraud under category six where a customer confirmed that he or she was told that her or his credit card would not be charged for 90 days and the card was charged immediately, or if a customer was told that the charge card would never be charged and it was only a test/play program. (Hearing Tr. Vol. II P. 200 L.6-24).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Mr. Ricciardi concluded, in his report to BancInsure, that the portion of category six claims that should be paid based on fraud was $326,000. (Def. Ex. J p.9). He also created another category, He made no dollar evaluation of the SourceOne or Acendix claims. Defendant's Exhibit K is a summary of Mr. Ricciardi's analysis of all of the individual claims.

On cross-examination, Mr. Ricciardi admitted that he was not a certified fraud examiner. He testified that he is not an expert in the credit card industry, in credit card processing or in chargebacks on credit cards . (Hearing Tr. Vol. II P.208 L.9-15). Mr. Ricciardi testified that when the eight hundred fifty hours of time his firm spent on this case, that would translate into one person's work for more than five months. He said, in making his analysis, that he had trouble reconciling in his mind that if the whole business of Golf Concepts was fraudulent, he could not believe that Heartland and Utica would be helping to perpetuate a fraudulent company. (Hearing Tr. Vol. II P.212 L.6-15). Mr. Ricciardi gave a lot of weight to the testimony of Mr. Carr that he did not witness any fraudulent activity after he began overseeing the operation. Mr. Ricciardi could not "fathom that Heartland would participate in a fraudulent - - continue to participate and perpetuate a fraudulent company." Mr. Ricciardi concluded that there were $800,000 in chargebacks after Mr. Carr assumed operations of Golf Concepts. He cannot say if the chargebacks were for transactions occurring before of after Mr. Carr's involvement. (Hearing Tr. Vol. III P.30 L.11-P31 L.3).

It appears to the Court that in addition to Mr. Ricciardi being too immersed in the details of the chargeback documents without sufficiently relating those to the overall financial information of Golf Concepts, that Mr. Ricciardi overlooks the broader fraudulent intent of those in control of Golf Concepts before Mr. Carr and Mr. O'Leary agreed to mitigate losses by attempting to salvage Golf Concepts. Mr. Ricciardi admits that Golf Concepts was utilizing a 90-day test/play program as its

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

"sales pitch." (Hearing Tr. Vol. II P.212 L.24-P.213 L.1). He recognized that Golf Concepts was not processing chargebacks, contrary to his earlier statement, but instead, Golf Concepts had to approve the chargebacks. He agreed that Golf Concepts' personnel were not calling customers and saying, "[b]uy these clubs for X dollars." (Hearing Tr. Vol. II P.214 L.13-16). As to testing data by customers and evaluation, he saw some sporadic survey forms, but he has no knowledge what was done with the forms, and he did not include any information related to the forms in his report. He did not conclude from Golf Concepts's representations that it was doing a test/play model, when all it was really doing was selling golf clubs, as fraudulent; rather he just thought it was a sales pitch similar to what is commonly seen on television. Other than the fact that Golf Concepts was operating at the "telemarketing level, individual level," Mr. Ricciardi concluded he did not have enough evidence to conclude Golf Concepts was utilizing any deceitful practices. (Hearing Tr. Vol. II P.216 L.21-25).

This testimony is not believable! Detailed analysis of the chargeback documents and other analysis performed is laudable, but not when the analyst ignores all of the undisputed information about the operations of the Company, and the facts which demonstrate that it was being operated based on misrepresentations to customers whose credit cards were being charged in a fashion that prohibited them from declining the charges to their credit cards. Mr. Ricciardi's testimony loses its value to the Court when he sacrifices his independence as an expert and without pretense, aligns his testimony in the unreliable realms of advocacy.

Mr. Ricciardi was shown a solicitation letter from Golf Concepts stating in bold capitol print that customers are not to call their credit card [companies] if they have disputes, and customers are being told to wait until the end of the 90-day test program is completed before seeking an

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

authorization. He admits the letter contains that information, but says he does not know if the information is deceitful or not. He testified, "I have no opinion on whether this is deceitful." (Hearing Tr. Vol. II P.218 L.2-17) (Pl. Ex.18D). He admits that he was only asked y BancInsure to determine if misrepresentations were being made "at the point of sale on the credit card side." However, it appears to the Court that Golf Concepts engaged in fraudulent behavior by telling customers to wait 90 days before seeking a return and not to call their credit card company before that time, when there is a limitation window for credit card companies to honor complaints and issue chargebacks. It is clear to the Court that either BancInsure unreasonably restricted Mr. Ricciardi in his assignment to allow him to capture a realistic approach to the fraudulent practices of Golf Concepts, or he turned a blind eye to obvious fraudulent behavior at Golf Concepts in his analytical responsibilities.

Mr. Ricciardi was shown a letter dated October 5, 1998, to Heartland's attorney from Mr. Bastian, Golf Concepts' attorney, expressing surprise to learn that Golf Concepts had $540,000 in unshipped golf clubs. He was asked, as a C.P.A., if it is a legitimate business practice to charge customers to the tune of over one-half million dollars and not ship product. He responded that this may very well be fraudulent, "and that's why I created that category four because if they were in fact selling clubs and charging customers and didn't have product to ship, then I would agree that would be a fraudulent transaction, . . . ." (Pl. Ex.9) (Hearing Tr. Vol. II P.221 L.10-24).

Mr. Ricciardi was referred to Defendant's Exhibit M where there were 19,000 chargebacks in 2000. Mr. Ricciardi cannot say when sales were made for those chargebacks. He knew that sales were cut off in 1999, so they could not have been made in 2000. He was asked to look at the period of April of 1999 through December 1999, when approximately $1.6 million in chargebacks were

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

recorded. He cannot say when those sales were made. (Hearing Tr. Vol. II P.224 L.22-P.225 L.25). He did not analyze the lag time between sales and chargebacks. (Hearing Tr. Vol. II P.225 L.19-P.226 L.9). This is further evidence of Mr. Ricciardi's unreliability as an expert. This is obviously important information in determining whether the 90-day test/play was fraudulent.

Mr. Ricciardi admits that 2.7 million in returns and chargebacks on sales of $6million, or 46% is "high." (Hearing Tr. Vol. II P.229 L.10-P.231 L.2). He was asked about people who followed the directives of the solicitation letter and waited 90 days without calling their credit card company until after the 60-day limitation period. He responded that he looked at the fraud at the point of sale, and "[w]hat you're looking at is what happened after the point of sale when they tried to return their clubs." He disagrees with cross-examination counsel that his report fails to list this subset of people by falling back on his unpersuasive argument that if people returned their clubs and Golf Concepts was out of money when the clubs were returned, money could not be refunded and therefore, there was no fraud. He also again falls back on how he limited the scope of his analysis by saying his was a different analysis, an analysis from the point of sale, not from the point of when the chargeback was processed. (Hearing Tr. Vol. II P. 232 L.7-P.233 L.7). This impuissant testimony is disappointing, demonstrating Mr. Ricciardi's prejudice in not considering the real issues in the case, and is entitled to little, if any, weight.

In compiling category six, Mr. Ricciardi did conclude that an individual, a salesperson or telemarketer within Golf Concepts acted fraudulently, and the dollar figure attached was in excess of $300,000. He very antiseptically concluded that some individual at Golf Concepts acted fraudulently, but "Golf Concepts did not defraud anybody." (Hearing Tr. Vol. II P. 240 L.25-P.241 L.18). This is a distinction that further erodes the reliability of Mr. Riciardi's testimony. Mr.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Ricciardi concluded there was $326,000 attributable to fraud of an individual, and when compared to alleged fraud of $1.5 million, he only found an 18% amount of fraud.

Mr. Ricciardi was cross-examined concerning his six categories that he prepared to address Heartland's claims. As to category one, he did not conclude that fraud was committed as there were no VITALS®, no communication with customers, and nothing at all except documentation of a chargeback. Accordingly, he recommends against paying this $372,000. (Hearing Tr. Vol. II P.243 L.7-21). In category two, there are VITALS®, but no supporting documentation to show fraud. This $241,000, he reported, should not be paid. (Hearing Tr. Vol. II P.243 L.22-P.245 L.23). As to category three, while he did have information from some customer, he found no evidence of fraud, where there was some detail provided, but he believed there was not evidence to support the claim that the charge was fraudulent for the claim of nearly $500,000. He did not attach any of the letters that he observed between the telemarketing sales staff and the customers. (Hearing Tr. Vol. II P.245 L.24-P.248 L.24) As to category four, he concludes that it is unclear if there was fraud, but there is the potential for fraud. He called this category, "unclear." He said, with respect to this category, there was the potential for fraud. Here, a consumer ordered clubs and never received them. Another customer received the clubs after a promised date for shipment and returned the clubs, immediately. Another customer believed he was participating in a test only program with no sales provisions. Another customer cancelled an order shortly after ordering the product. Another customer received different clubs or clubs with different specifications than expected. These were customers with complaints that went to their credit card company and requested a refund. Mr. Ricciardi said, " these were chargebacks that came back through." He admitted that customers ordered clubs, never received them and never got their money back. (Hearing Tr. Vol. II P. P.248 L.25-P.252 L.20). In

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the $1.8 million claim, Mr. Ricciardi created a separate category five for one $490 charge. The charge was run through Golf Concepts' account, but it was someone else's chargeback that got processed through Golf Concepts. Why this is listed as a separate category when admittedly it does not pertain to Golf Concepts lends nothing to the resolution of this case.

Category six lists concluded fraud at $327,000. He listed no examples of fraud, he just told BancInsure it was fraud. (Hearing Tr. Vol. II P.255 L.25- P.256 L.12). His itemization of the different conducts constituting fraud under his category six included his conclusion that a salesperson may have misrepresented the product, in that a salesperson misrepresented the program as a test only with no sales provisions, i.e. a Golf Concepts' salesperson told an individual that there would be no charge of their card until a decision was made to buy the clubs when, in fact, cards were charged or the consumer was told that only a hold was being made, with no charge on the card, and an immediate charge on the card was made. This was all Mr. Ricciardi was able to prove conclusively that constituted fraud. (Hearing Tr. Vol. II P.256 L.13-P.258 L.2). Mr. Ricciardi admits that of the $1.5 million in chargebacks, he had enough information to conclude that there was $327,000 involving fraud, but he lacked sufficient information to conclude there was any other fraud. He testified if other information had been supplied to him he would have considered information other than chargeback information but it was not supplied to him. He testified that BancInsure was aware that he was missing information but it was never supplied to him. He asked BancInsure for the information and it was never provided to him. (Hearing Tr. Vol. II P.258 L.3-P.259 L.5; P.259 L.20-P.260 L.9).

Mr. Ricciardi was asked if he looked at the Golf Concepts' application with Heartland and if it was important to him that Golf Concepts represented that they were an 80% inbound merchant

when, in fact, they were a 100% or almost 100% outbound telemarketer, and whether it was "considered in your opinion on whether the 1.5 million dollars that you didn't have enough information on what was fraudulent or nonfraudulent?" Earlier, he said he had looked at the application, and in response to this question responded, "[n]o, I wouldn't have necessarily considered that or even know how those would fit together." (Hearing Tr. Vol. II P.263 l.1-17). He refused to let his opinion concerning one chargeback influence what might have occurred on another chargeback.

Mr. Ricciardi concluded that in reality, Golf Concepts was refunding money to some of the customers every month, directly, upon requests for refunds starting in March, 1998, so the Company was not trying to hold peoples' money for 90 days and not return it. (Pl. Ex.3) (Hearing Tr. Vol. III P.33 L.16-23).

Mr. Ricciardi's opinion was that he "could not come to the conclusion that this particular overall company was fraudulent; but that, based on the individual chargeback documentation I provided, that there certainly [is] a very good chance that there was fraud committed at the individual sales level of $326,724.90, which is my category six." (Hearing Tr. Vol. III P.36 L.19-24). He also stated that, "depending on the circumstances," the $381,000 in chargebacks that fell into category four "could turn out to be fraudulent." (Hearing Tr. Vol. II P.181 L.11-18, P.264 L.5-6).

On re-cross examination, Mr. Ricciardi admits that "eventually[,] almost 50 percent of the people who had any dealings with this [C]ompany asked for their money back . . ." (Hearing Tr. Vol. III P.38 L.1-4). He acknowledged that if a customer was compliant with Golf Concepts' notice and waited 90 days to contact their credit card company, and the credit card company said, "sorry[,] [y]ou've waited too long," that they would not be included in the "almost 50 percent" of customers

who asked for their money back. Specifically, Mr. Ricciardi said, "[y]eah,, I mean obviously if someone was denied a chargeback and didn't return it, it wouldn't be in here. That's a true statement." (Def. Ex. M) (Hearing Tr. Vol. III P.38 L.5-14). Mr. Ricciardi recognizes that for the month of June, with over $680,000 in sales, less than 10% were actually given a credit. (Hearing Tr. Vol. III P.38 L.16-21). He agreed that the other 40% ended up in a chargeback in 1999.

## II.  CONCLUSIONS OF LAW

## A.  STANDARD OF PROOF

Equitable contribution is a means of recovery which requires the insurers of a commonly insured loss to prorate the loss in proportion to the amount of coverage available under their respective policies. *Federal Ins. Co. v. Gulf Ins. Co.*, 162 S.W.3d 160, 164 (Mo. Ct. App. 2005). Through this standard of recovery, an insurer who pays more than its share of the claim is able to recover the excess from the other insurer. *Id.* The standard of proof in civil actions is a preponderance of the evidence. *Amrine v. Roper*, 102 S.W.3d 541, 548 (Mo. banc 2003); *Bonney v. Environmental Engineering, Inc.*, 224 S.W.3d 109, 120 (Mo. Ct. App. 2007). Despite the need to consider whether fraudulent acts falling under the coverage of the BancInsure policy occurred, this is not an action for fraud and as a result we do not need to consider the clear and convincing standard that is sometimes used to adjudicate fraud claims. *Gibson v. Smith*, 422 S.W.2d 321, 328 (Mo. 1968) (Interpreting Missouri law regarding the standard of proof in fraud actions, determining the proper standard is a preponderance of the evidence). As a result, Utica must prove by a preponderance of the evidence that Golf Concepts' chargeback losses were the result of fraud, and that those losses were covered under the BancInsure policy.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

## A. THE MERCHANT BANKCARD APPLICATION IS NOT INADMISSABLE HEARSAY

The Merchant Bankcard Application that was submitted to Heartland in order to secure Heartland's services in processing Golf Concepts' credit card transactions was offered by Utica as Plaintiff's Exhibit 1 ("Exhibit 1"). At trial, Exhibit 1 was admitted over BancInsure's objection on the basis that Exhibit 1 was inadmissable hearsay. When this document was admitted into evidence, the Court agreed to receive the document, but added that objections should be made in post trial briefs as "there may very well be parts of it that are irrelevant, and if in any briefing it is believed that there are parts that are hearsay, irrelevant, immaterial, and for any reason not admissible, that should be raised . . ." (Hearing Tr. Vol. I P.107 L.17-25). In their post trial briefs to this Court, BancInsure specifically alleges that Utica failed to lay a proper foundation for the document as they did not authenticate the signature of William Teague on the application. Additionally, BancInsure asserts that the signature and content of the application are inadmissable hearsay.

Even though the objection over the authentication of William Tegue's signature was not made at trial, the Court will consider this objection as it was made in BancInsure's post trial brief. The Advisory Committee Notes to Federal Rule of Evidence 901 state that "a document . . . may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." This document included information[7] about Golf Concepts and William Tegue that would only have been know by William Tegue or someone acting as an agent on Golf

---

[7] The Merchant Bankcard Application contains information such as the address of William Teague's personal residence and his social security number, the name of the company from whom Golf Concepts' leased their business premises, the name of Golf Concepts' bank along with account number and routing number, as well as a Personal Financial Statement listing all of William Teague's assets.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Concepts' behalf in order to secure Heartland's services in processing credit card transactions. This is "sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901. The Court is further persuaded to consider Exhibit 1 to have been properly authenticated by Utica's statement in their Post-Trial Reply Brief that "[i]f BancInsure had made such an objection at trial, Utica could have elicited further testimony on the subject from Mr. Carr. As noted in Utica's Opposition to BancInsure's motion in limine on the same issue . . . Mr. Carr had previously testified at his deposition as to the authenticity of the document."

As the Court held when BancInsure argued Exhibit 1 was hearsay in a motion to exclude prior to trial, Exhibit 1 is admissible as it was not offered for the truth of the matter asserted. Rather, Plaintiff seeks to have this document admitted merely to prove that the assertions therein were made. "Evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement." *Anderson v. United States*, 417 U.S. 211, 221 n.8 (1974). Parties may admit statements such as these "so as to establish a foundation for later showing, through other admissible evidence, that they were false." *Id.* at 220. The Court did not consider the information in Exhibit 1 for the truth of the matter asserted, but merely as evidence that a statement was made, so the Court could then compare that statement to the true nature of Golf Concepts' business.[8] The Court also notes that while this document was admitted and considered by the Court, it was not necessary for the Court's decision in this case.

## C.  THE 'OTHER INSURANCE' CLAUSES MUST BE DISREGARDED

---

[8] For this purpose, the Plaintiff's Exhibit 1 is admissible. Since no other purpose is required of this document, the Court declines to consider whether this document would be admissible as a Business Record under Federal Rule of Evidence 803(6).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Both the Utica and BancInsure policies contain what is known as an 'other insurance' clause. There are several varieties of 'other insurance' clauses, but the type at issue today is known more specifically as an excess clause. *See In re Popkin & Stern*, 340 F.3d 709, 716 (8th Cir. 2003). This type of clause generally asserts that if another insurance policy applies to claims covered by this policy, the insurance under this policy is considered to be excess and will not be paid to the claimant until the other insurance has been exhausted. *Id.* However, when two insurance companies cover the same risk, and each policy contains an 'other insurance' clause, the clauses "are treated as mutually repugnant and are disregarded." *Federal Ins. Co. v. Gulf Ins. Co.*, 162 S.W.3d 160, 164 (Mo. Ct. App. 2005). The 'other insurance' clauses in the two policies at issue have slight variations in wording, however, they are very similar.

Text from Utica policy:

> If any other insurance or indemnity covering any "loss" covered by this policy is available to the Insured, this policy shall only apply to that part of such "loss" which exceeds the amount recoverable from such other insurance or indemnity.

Text from BancInsure policy:

> Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the insured, or by another entity on whose premises the loss occurred or which employed the person causing the loss.

While the wording used in these clauses is different, these two policies "are indistinguishable in meaning and intent." *In re Popkin & Stern*, 340 F.3d at 717 (*quoting Arditi v. Massachusetts Bonding & Ins. Co.*, 315 S.W.2d 736, 743 (Mo. 1958)). When clauses are as similar as these, a court cannot select between them, and the clauses in both insurance policies must be disregarded. *In re Popkin & Stern*, 340 F.3d at 717.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

When 'other insurance' clauses are disregarded, each insurer becomes "liable for its pro rata share of the loss based on a comparison of the policy limits." *Id.* at 716. The policy holder, or in this case, Utica, as the party seeking coverage, bears "the burden of proving coverage." *Citizens Ins. Co. of America v. Leiendecker*, 962 S.W.2d 446, 451 (Mo. Ct. App. 1998). The party seeking equitable contribution must establish the allocation between covered and non-covered damages. *See Royal Ins. Co. of America v. Kirksville College of Osteopathic Medicine, Inc.*, 304 F.3d 804, 807 (8th Cir. 2002). This allocation is critical as no liability "'*will rest upon the insurer if the recovery is on a noncovered claim.*'" *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 970 (8th Cir. 1999) (emphasis in original) (*quoting Dickman Aviation Servs., Inc. v. United States Fire Ins. Co.*, 809 S.W.2d 149, 152 (Mo. Ct. App. 1991)).

## D. COLLATERAL ESTOPPEL REQUIRES FINDING THAT POLICIES OFFERED CONCURRENT COVERAGE, WITH RESPECT TO ACTS OF FRAUD

Prior to trial, Utica filed a Motion for Judgment on the Pleadings to prevent BancInsure from relitigating the issue of whether equitable contribution applies as both the Missouri Circuit Court and the Missouri Court of Appeals previously decided that Utica and BancInsure afforded Heartland concurrent coverage. The "judicial proceedings of any court [of any state] . . . Shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the court s of such State . . . from which they are taken." 28 U.S.C. § 1738. This is otherwise known as the "full faith and credit" doctrine and it requires that a federal court give a state court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered. *See Allen v. McCurry*, 449 U.S. 90, 96 (1980);

31

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

*Sanders v. Frisby*, 736 F.2d 1230, 1231 (8th Cir. 1984). Thus, Missouri law guides this Court's determination of whether collateral estoppel applies in this case.

Under the doctrine of collateral estoppel, or issue preclusion, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party (or a party in privity with a party) to the prior litigation. *Montana v. United States*, 440 U.S. 147, 153 (1979). Collateral estoppel applies to prevent the relitigation of the same issues in a subsequent case. *Oates v. Safeco Ins. Co.*, 583 S.W.2d 713, 719 (Mo. Ct. App. 1979). In determining whether collateral estoppel applied, this Court looked at whether (1) the issue in the prior proceeding is identical to the issue in the present action; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to relitigate the issue in the prior suit. *In re Carey*, 89 S.W.3d 477, 498 (Mo. 2002) (*citing In re Caranchini*, 956 S.W.2d 910, 912-13 (Mo. banc 1997).

In ruling on Utica's Motion for Judgment on the Pleadings, the Court noted that the Missouri Court of Appeals already determined the preclusive effect of the Circuit Court's ruling on the issue of concurrent coverage. *Heartland Payment Systems, L.L.C. v. Utica Mutual Ins. Co.*, 185 S.W.3d 225, 232 (Mo. Ct. App. 2006). Accordingly, the Court ruled in favor of Utica's Motion for Judgment on the Pleadings, and will affirm that decision today. Had BancInsure brought their claim (regarding whether the Utica policy and the BancInsure policy provided Heartland concurrent coverage with respect to fraudulent acts) in a Missouri court rather than here, the Missouri court would have determined that there was concurrent coverage. The Missouri Court of Appeals made

this clear in their opinion when they stated that Utica had a claim against BancInsure for equitable contribution because both parties "afforded Heartland concurrent coverage." *Id.* at 233. Therefore, collateral estoppel demands that this Court find that the Utica and BancInsure policies afforded Heartland concurrent coverage, with respect to acts of fraud.

**E.    THE CHARGEBACK LOSSES ARE DUE TO GOLF CONCEPTS' FRAUDULENT SCHEME, AND FALL UNDER THE COVERAGE OF THE BANCINSURE POLICY**

Accordingly, what is left for this court to determine is whether the chargeback losses were the result of fraud such that they fall under the coverage of the BancInsure policy, and if so, then the Court must determine what quantity of the losses fall under BancInsure's policy. The BancInsure policy is a Plastic Card Fraud Policy, and is limited by its terms to only cover certain fraud losses. The two relevant circumstances detailed in the policy are:

**A.    Merchant Fraud**

Loss resulting directly from the Insured's Uncollectible chargeback, or series of Uncollectable chargebacks, to a Merchant to the extent the chargeback, or series of chargebacks, is the result of fraud committed by such Merchant involving the use of Plastic Cards.

. . . .

**D.    Telephone Sales and Mail Order Merchant Fraud**

Loss resulting directly from an Uncollectable chargeback, or series of Uncollectable chargebacks, to a Merchant to the extent the chargeback, or series of chargebacks, is the result of fraud committed by the telephone sales and/or mail order Merchant(s) involving the use of a Plastic Card.

"'If a term within an insurance policy is clearly defined, the contract definition controls.'" *Thornburgh Insulation, Inc. v. J.W. Terrill, Inc.*, Nos. ED 89043, ED 89056, 2007 WL 2701303, at *2 (Mo. Ct. App. Sept. 18, 2007) (*quoting State Farm Mut. Auto Ins. Co. v. Ballmer*, 899

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

S.W.2d 523, 525 (Mo. banc 1995). However, fraud is not defined in the BancInsure policy. As a result, the interpretation of the above provisions is a question of law. *Mo. Consol. Health Care Plan v. BlueCross BlueShield of Mo.*, 985 S.W.2d 903, 908 (Mo. Ct. App. 1999).

The "'cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent.'" *Helterbrand v. Five Star Mobile Home Sales, Inc.*, 48 S.W.3d 649, 658 (Mo. Ct. App. 2001) (*quoting Missouri Consol. Health Care Plan v. BlueCross BlueShield of Missouri*, 985 S.W.2d 903, 909 (Mo. Ct. App. 1999)). BancInsure did not call any witnesses to testify regarding what they intended the terms of this insurance policy to cover. However, Mr. Carr, the Chief Executive Officer for Heartland, testified that they purchased this policy because Heartland "wanted to be covered basically for merchants' fraud because if merchants went out of business and didn't pay their fees . . ." (Hearing Tr. Vol. II P.67 L.22-24). Mr. Carr essentially claims that he sought to procure insurance coverage to protect Heartland against the exact circumstances that took place here.

In interpreting contract provisions, "we must give the language used its plain and ordinary meaning." *Stotts v. Progressive Classic Ins. Co.*, 118 S.W.3d 655, 662 (Mo. Ct. App. 2003). This should be "the meaning that the average layperson would understand." *Shahan v. Shahan*, 988 S.W.2d 529 (Mo. banc 1999). To determine the ordinary meaning of a word, the Court "consults standard English language dictionaries." *Id.*

When the "insurance policy is unambiguous, it will be enforced as written . . . If the language is ambiguous, however, it will be construed against the insurer." *Watters v. Travel Guard Intern.*, 136 S.W.3d 100, 107 (Mo. Ct. App. 2004) (*citing Peters v. Employers Mutual*

*Casualty Co.*, 853 S.W.2d 300, 302 (Mo. banc 1993). In determining whether a term is ambiguous the Court must consider whether "there is duplicity, indistinctness, or uncertainty in the meaning of the words." *Gavan v. Bituminous Cas. Corp.*, No. ED 88258, 2007 WL 1672918, at *4 (Mo. Ct. App. June 12, 2007) (*citing Watters*, 136 S.W.3d at 108). Language in an insurance policy is ambiguous if, "'when viewed in the meaning that would ordinarily be understood by the lay people who bought the policy, it is reasonably open to different constructions.'" *Watters*, 136 S.W.3d at 108 (*quoting Eagle Boats, Ltd. v. Continental Insurance Company Marine Office of America, Corp.*, 968 S.W.2d 734, 736 (Mo. Ct. App. 1998)).

A cursory glance at the many definitions and various types of fraud in Black's Law Dictionary reveals that individuals may construct this term differently. However, the Court finds that the term fraud is generally understood to lay persons, and therefore is not ambiguous. As a result, the Court will enforce the policy as written, and will not construe this language against BancInsure. In interpreting the "plain and ordinary meaning" of these contractual provisions, this Court has considered several definitions of fraud. *Stotts*, 118 S.W.3d at 662. The first definition of fraud found in Black's Law Dictionary is "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment."[9] Black's Law

---

[9] Black's Law Dictionary defines fraud in the inducement as "[f]raud occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved; an intentional misrepresentation of a material risk or duty reasonably relied on, thereby injuring the other party without vitiating the contract itself . . ." Black's Law Dictionary 687 (8th ed. 2004). The evidence presented at trial demonstrated that the information contained in the Merchant Bankcard Application that was submitted to Heartland was false. As discussed above, the Court did not consider the information in Exhibit 1 for the truth of the matter asserted, but merely as evidence that a statement was made, so the court could then compare that statement to the true

Dictionary 685 (8th ed. 2004). The American Heritage College Dictionary defines fraud as, "[a] deception deliberately practiced to secure unfair or unlawful gain." American Heritage College Dictionary 541 (3rd ed. 1993). Webster's Dictionary describes fraud as "an instance or an act of trickery or deceit esp[ecially] when involving misrepresentation." Webster's Third New International Dictionary 904 (3rd ed. 1993). Additionally, business practices provide evidence of what a lay person would consider fraudulent behavior. This would certainly apply to the affidavit signed by William Teague which stated that Golf Concepts "acknowledges that the act of processing a credit card sale for the purpose of receiving money for a sale which has not been fulfilled is fraudulent . . . and is expressly forbidden by the agreement."

The evidence demonstrates that the chargeback losses suffered by Heartland were not the result of mistake or accident. These losses were due to fraud. Fraud was committed when the program was misrepresented to customers as a test only with no sales provisions. (Hearing Tr. Vol. II P.257). Fraud was committed when customers were told that their card would not be charged until a decision was made to buy the clubs, but charged the card regardless. (Hearing Tr. Vol. II P. 257). Fraud was committed when customers were told not to call their credit card company. (Hearing Tr. Vol. I, P.189-190). Fraud was committed when Golf Concepts charged their customer's credit cards before fulfilling the sale, in direct contradiction of the affidavit signed by William Teague. (Hearing Tr. Vol. I, P.133 L.7-8). Fraud was committed when Golf Concepts represented to customers that they would get a full refund if the clubs were returned

---

nature of Golf Concepts' business. Exhibit 1 indicates that fraud in the inducement may have been committed, however, the Court's decision today is not based on the information in Exhibit 1, but rather the fraudulent sales methods, and other fraudulent practices, utilized by Golf Concepts.

during or after the 90-day trial period, but then failed to refund customers' money when they returned the clubs.  (Hearing Tr. Vol. I, P.144 L.25 - P.145 L. 4).  Fraud was committed when Golf Concepts told customers they were only placing a 'hold' on their credit card, but then charged the card immediately.  (Hearing Tr. Vol. II P.257).  Fraud was committed when customers were told that the clubs they would receive were prototypes when they were actually sent "knock-offs."  (Hearing Tr. Vol. I P.199 L.8-12).

In all of the instances detailed above, Golf Concepts tricked or deceived their customers in order to secure a financial gain.  This is the very essence of fraud.  Golf Concepts made misrepresentations to their customers in order to secure their authorization, and would then pocket their customer's money and employ tricks and other fraudulent practices in order to prevent having to issue refunds.  The Court interprets the provisions of the BancInsure policy to encompass these fraudulent acts of Golf Concepts.

In reaching the conclusion that these acts were covered under the BancInsure policy, the Court first determined that Section D of the BancInsure policy is merely a subset of Section A.  The wording used in these provisions is identical, except that Section D is limited to fraud that is "committed by the telephone sales and/or mail order."  As a result, if the Court finds that fraud was committed which falls into Section D, that fraudulent act would also fall under the definition and coverage of Section A.  However, it is important to note that the determination of whether an act falls under Section A or Section D of the BancInsure policy has little practical effect.  Fraudulent acts falling under either Section of the BancInsure policy will result in BancInsure being liable for their pro rata share of the losses resulting from those fraudulent acts.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

To fall under the coverage provided by the BancInsure policy, the uncollectible chargebacks must be "the result of fraud committed by such Merchant [Golf Concepts] involving the use of Plastic Cards." It is unfortunate that fraud is not defined in the BancInsure policy. However, in this case a definition is not necessary. The term fraud has a readily understandable meaning that encompasses the acts detailed above. Several of the fraudulent acts detailed above took place in the course of Golf Concepts' solicitation of customers through the use of telemarketing or "telephone sales." These particular fraudulent acts[10] fall under the coverage of both Sections A and D of the BancInsure policy, while the remaining acts fall under the coverage of Section A alone.

The finding that fraud falling under the BancInsure policy was committed is supported by the expert testimony that was presented at trial. Every expert witness testified that Golf Concepts defrauded customers. However, there was disagreement among these experts as to what quantity of the chargeback losses could be attributed to fraud. Ms. Solomon, an expert for Utica, testified that all of the chargeback losses were the result of Golf Concepts' fraudulent scheme. (Hearing Tr. Vol. I P.203 L.12 - P.207 L.3). Mr. Ricciardi, BancInsure's expert witness, stated that at least $326,724.90 worth of the chargeback losses were the result of fraudulent conduct by Golf

---

[10] Fraudulent acts falling under both categories include (1) misrepresenting the program to customers as a test only with no sales provisions. (Hearing Tr. Vol. II P.257); (2) telling customers that their card would not be charged until a decision was made to buy the clubs, but charging the card regardless. (Hearing Tr. Vol. II P. 257); (3) representing to customers that they would get a full refund if the clubs were returned during or after the 90-day trial period, but then failing to return customers' money when they returned the clubs. (Hearing Tr. Vol. I, P.144 L.25 - P.145 L. 4); (4) telling customers they were only placing a 'hold' on their credit card, but then charging the card immediately. (Hearing Tr. Vol. II P.257); (5) telling customers that the clubs they would receive were prototypes when they were actually "knock-offs." (Hearing Tr. Vol. I P.199 L.8-12).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Concepts. He added that, depending on the circumstances, an additional $381,000 of chargeback losses could be fraudulent, and that he couldn't determine whether the remaining chargeback losses[11] were or were not the result of fraud. Mr. Carr, the Chief Executive Officer for Heartland and a witness called by both BancInsure and Utica, testified that he considered "virtually all of [the chargeback losses] to be fraudulent." (Hearing Tr. Vol. II P.54 L.3-9). He opined that the owners of the company committed fraud when they "directed their people to . . . charge cards without sending out golf clubs" so that they could abscond with "all the money out of the company." (Hearing Tr. Vol. II P.79 L. 25 - P.80 L. 8; Hearing Tr. Vol. II P.95 L.14-19).

As previously indicated, Mr. Ricciardi's testimony as to which chargeback losses are the result of fraud is simply unbelievable. He appears to be guilty of willful blindness in the course of his investigation of these chargebacks. Mr. Ricciardi considered little, if any, evidence other than the chargeback documents themselves. "An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported." *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005). It is important to consider the opinion's basis and to scrutinize where the proffered expert opinion emanates. "Any weaknesses in the factual underpinnings of (the expert's) opinion go to the weight and credibility of his testimony." *South Cent. Petroleum, Inc. v. Long Bros. Oil Co.*, 974 F.2d 1015, 1019 (8th Cir. 1992) (*quoting Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989). While Mr. Ricciardi's detailed analysis of the

---

[11]Mr. Ricciardi was able to identify one $490 chargeback that was not the result of fraud as it actually was a chargeback for another company that was incorrectly charged to Golf Concepts' account. This chargeback was classified as "category five."

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

chargeback documents initially appears persuasive, his findings lose their credibility as they were not made with consideration of the broader scope of Golf Concepts' operations in mind.

The evidence presented at trial persuades the Court that all of the chargeback losses suffered by Heartland were the result of Golf Concept's fraudulent actions. These fraudulent actions were Merchant Fraud and Telephone Sales and Mail Order Merchant Fraud, and fall under the coverage of the BancInsure policy. These fraudulent acts were the cornerstone of Golf Concepts' overarching fraudulent scheme, and they resulted in all of the chargeback losses that were suffered by Heartland, with the exception of the one $490 chargeback Mr. Ricciardi classified as "category five," in which another company's chargeback was processed through Golf Concepts' account. Accordingly, judgment shall be entered in favor of Utica with respect to Count I.

## II.     CALCULATION OF DAMAGES

### A.     PAYMENT AS AN AFFIRMATIVE DEFENSE

Hartland settled their claims with BancInsure regarding SourceOne, Ascendix and Golf Concepts for $1,000,000.[12] (Hearing Tr. Vol. II P.130 L.22 - P.138 L.12). Payment is an affirmative defense, and under both Missouri law and Eighth Circuit precedent it must be properly pled. *McHenry County Credit Co. v. Feuerhelm*, 720F.2d 525, 527 n.5 (8th Cir. 1983); Fed. R. Civ. P. 8(c); Mo. Sup. Ct. R. 55.08. An affirmative defense that is not properly pled is waived. *Jacobs Manufacturing Co. v. Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir. 1994). BancInsure

---

[12] SourceOne and Ascendix are separate companies, unrelated to Golf Concepts.

failed to raise this affirmative defense in their pleadings or at trial, and as a result, BancInsure cannot get credit for any portion of the amount paid as part of this settlement agreement.

## B.    UTICA IS ENTITLED TO EQUITABLE CONTRIBUTION FROM BANCINSURE IN THE AMOUNT OF $978,809.98

Utica has paid more than it's pro rata share, and as a result Utica is entitled to equitable contribution from BancInsure. Total chargeback losses suffered by Heartland amounted to $1,819,376.51. There was no concurrent coverage for BancInsure's $500,000 deductible that was paid by Utica, nor was there concurrent coverage over the $490 "category five" chargeback. As a result there was concurrent coverage over chargeback losses in the amount of $1,318,886.51. Utica and BancInsure are liable for their "pro rata share of the loss [for which there was concurrent coverage] based on a comparison of the policy limits." *In re Popkin & Stern*, 340 F.3d 709, 716 (8th Cir. 2003).

Pro rata shares are to be determined according to the amount of coverage provided by the respective policies. In determining the pro rata shares of the two policies, the Court considered the fact that Utica paid $500,000 towards the deductible on BancInsure's policy. There was no concurrent coverage for this amount, and as a result, fairness dictates that this sum be removed from consideration in determining the relative policy limits. Therefore, Utica's policy limit will be calculated at $700,000 rather than the full $1.2 million coverage provided under the Utica Policy. The pro rata split is then based on a combined coverage of $10.7 million with $700,000 under the Utica policy and $10 million under the BancInsure policy. This results in Utica being responsible for 6.54% and BancInsure responsible for 93.46%, or $1,232,631.33, of the chargeback losses. However, this sum exceeds the actual amount paid by Utica to Heartland. The Court finds that it

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

would not be equitable to make an equitable contribution award greater than what was actually lost by Utica.

Utica paid $1,112,338.80 to Heartland, and fully acknowledges liability to Heartland for the amount of $133,528.82, which includes both Utica's pro rata share of the concurrent coverage and interest accrued prior to payment to Heartland on December 6, 2005. The equities require that BancInsure pay the balance of $978,809.98.

## C. UTICA IS ENTITLED TO PREJUDGMENT AND POSTJUDGMENT INTEREST

In Count II of their First Amended Complaint, Utica requests an award of prejudgment interest. Utica is entitled to prejudgment interest. Under Missouri law, "prejudgment interest must be awarded whenever the amount due is liquidated, or although not strictly liquidated, is readily ascertainable by reference to recognized standards." *Hampton Foods Inc. v. Aetna Casualty and Surety Co.*, 787 F.2d 349, 353 (8th Cir. 1986); *see also* Mo. Rev. Stat. § 408.020. The parties disagree as to what rate should be applied between the Missouri statutory interest rate or the Treasury Bill rate. "Although *postjudgment* interest is a procedural matter governed by federal law, state law determines the rate of *prejudgment* interest." *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 497 (8th Cir. 2001) (emphasis in original) (*citing Weitz Co., Inc. v. Mo-Kan Carpet, Inc.*, 723 F.2d 1382, 1385-86 (8th Cir. 1983); *Nodaway Valley Bank v. Continental Cas. Co.*, 916 F.2d 1362, 1367 (8th Cir. 1990)). Section 408.020 states that unless otherwise agreed by the parties, interest is to be computed at the Missouri statutory rate of 9%. Mo. Rev. Stat. § 408.020. As no such agreement has been made, Utica is entitled to prejudgment interest at the rate of 9%.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Under Missouri law, prejudgment interest will begin to accrue on a written contract after it becomes "due and payable," or on an account after it becomes "due and demand of payment is made." Mo. Rev. Stat. § 408.020. There are several dates this Court could use as a start date for the accrual of interest, for instance; the date Heartland filed a proof of loss form with BancInsure, the date Heartland filed suit against Utica and BancInsure in state court, the date Utica filed a cross-claim against BancInsure in the action in state court, the date the state court entered judgment against Utica, or the date Utica paid that judgment. However, it appears that the most appropriate date, given the nature and facts surrounding this suit, is the filing date of the present lawsuit. There was no contract between the actual parties to this suit, and as a result, the rule dealing with accounts appears to be the most applicable to the facts at hand. "Absent an earlier demand, Missouri law considers the date that the lawsuit was filed as the date of demand." The date of Utica's cross-claim against BancInsure does not appear to satisfy the demand requirement as judgment had not yet been entered and the amount was not due. *See* Mo. Rev. Stat. § 408.020. As a result, this court is left with the date the present action was filed as the first date in which both the amount was due and a demand was made. As a result, prejudgment interest at the Missouri statutory rate of 9% should be computed beginning on March 2, 2006.

Plaintiff also requests an award of postjudgment interest. As stated above, "*postjudgment interest is a procedural matter governed by federal law.*" *Swope*, 243 F.3d at 497 (emphasis in original) (*citing Weitz Co., Inc.*, 723 F.2d at 1385-86). Interest is allowed upon money due "on any money judgment in a civil case recovered in a district court . . . calculated from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield."

§ 28 U.S.C. 1961.  Interest is to be "computed daily to the date of payment . . . and shall be compounded annually." 28 U.S.C. § 1961.

Because all of the chargebacks were the result of a fraudulent scheme, the BancInsure policy covers the loss and Utica is entitled to equitable contribution in the amount of $978,809.98, plus prejudgment interest at the rate of 9%, accrued from March 2, 2006 through the date this judgment is entered, and postjudgment interest at the Treasury Bill rate.

Accordingly,

**IT IS HEREBY ORDERED** that judgment is ordered in favor of Utica.  BancInsure is ordered to pay Utica the principal amount of $978,809.98 along with prejudgment interest at the rate of 9%, accrued from March 2, 2006 through the date of this judgment, and postjudgment interest at the Treasury Bill rate.

**IT IS FURTHER ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law [doc. #90] is **DENIED**.

An appropriate Order of Judgment shall accompany this Order.

Dated this 25th day of September, 2007.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com